UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
CHRISTOPHER VON STEIN,

                               Plaintiff,

        - against -

DEPUTY COMMISSIONER JUSTIN D.
PRUYNE, PAMELA RIVERA, LISSA
GRAVELINE, and LISA HOY,

                            Defendants.
-------------------------------------------------------------x

**OPINION & ORDER**

No. 15-CV-7039 (CS)

Appearances:

Christopher von Stein
Bronx, New York
*Pro se Plaintiff*

Irma Cosgriff
Senior Assistant County Attorney
Office of the Westchester County Attorney
White Plains, New York
*Counsel for Deputy Commissioner Justin D. Pruyne*

Michael J. Keane
Assistant Attorney General
Office of the Attorney General for the State of New York
New York, New York
*Counsel for Defendants Pamela Rivera, Lissa Graveline, and Lisa Hoy*

Seibel, J.

         Before the Court are the motion for summary judgment of Defendants Pamela Rivera,

Lissa Graveline, and Lisa Hoy (collectively, the "State Defendants"), (Doc. 175); the motion for

summary judgment of Defendant Justin D. Pruyne (the "County Defendant" or "Pruyne"), (Doc.

177); and the cross-motion for summary judgment of Plaintiff Christopher von Stein, (Doc.

205).[1]  For the following reasons, State Defendants' and County Defendant's motions for summary judgment are GRANTED, and Plaintiff's cross-motion for summary judgment is DENIED.  Notwithstanding that outcome, this case presents troubling issues, and the Court trusts that counsel for Defendants will educate their respective clients, and their clients' agencies, on how to avoid in the future situations like the one presented here.

## I.    **BACKGROUND**

The following facts are based on the parties' Local Civil Rule 56.1 Statements, (Doc. 178 ("State Ds' 56.1"); Doc. 186 ("County D's 56.1"); Doc. 206 ("P's 56.1"); Doc. 198 ("P's 56.1 Corrections")),[2] and the parties' Responses, (Doc. 191 ("County D's 56.1 Resp."); Doc. 199 ("State Ds' 56.1 Resp."); Doc. 209 ("P's 56.1 Resp. to County D"); Doc. 210 ("P's 56.1 Resp. to State Ds")), and are undisputed unless otherwise noted.[3]

---

[1] State Defendants electronically filed Plaintiff's papers for him, (*see* Docs. 195-197, 199, 201-202), but Plaintiff complained about the legibility and completeness of the filings, so, with Plaintiff's consent, State Defendants resubmitted all of Plaintiff's papers, (*see* Doc. 204), including Plaintiff's cross-motion, (*see* Doc. 205).  Unless otherwise noted, the Court's references to Plaintiff's papers here are to the corrected and complete versions, not those that State Defendants initially filed for Plaintiff.

[2] County Defendant moved to strike Plaintiff's 56.1 Statement.  (Doc. 169.)  The Court declined to decide the letter motion then, (Doc. 171), and after receiving and reviewing all of the papers in this case, the Court will not strike Plaintiff's 56.1 Statement.  While it is over the page limit, much of it is improper argument that the Court will not consider.  (*See, e.g.*, P's 56.1 ¶¶ 113-120.)  Additionally, the time it would take to have Plaintiff resubmit and Defendants respond is not a good use of the Court's or the parties' time.  Finally, even if I required Plaintiff to file a shorter 56.1 Statement, it would not change the outcome of this Opinion.

[3] Before the Court undertakes any factual or legal analysis, it expresses its dissatisfaction with the parties' papers in this case.  Plaintiff in his submissions disregarded the Federal Rules of Civil Procedure and the Local Rules, *see* note 4 below, as well as my Individual Practices.  The Court understands that he is a *pro se* litigant, but he has elsewhere complied at least with the Court's Individual Practices, so the Court knows he is capable of doing so, and it does not take a law degree to read and understand that my Individual Practices limit submissions to twenty-five double-spaced pages absent special permission.

A.    **Facts**

Plaintiff was convicted of Assault in the Second Degree, a Class D felony, in 2012 in

Putnam County, New York (the "Putnam County Sentence"). (State Ds' 56.1 ¶ 5.)[4]  He was

_____

Turning to the State Defendants, they too made simple and inexcusable errors. All of the electronically filed declarations in support of State Defendants' motion were unsigned (although the courtesy hard copies were signed). They electronically filed one of their declarations upside-down. (Doc. 183.) The State Defendants failed to comply with the straightforward Local Rule 56.2, *see* note 4 below, and perhaps did not provide sufficient notice to the *pro se* Plaintiff of their motion and what Plaintiff needed to do to properly respond. They included a half-page footnote explaining why "Plaintiff is confused about the dates" in this case, yet within that same footnote repeatedly wrote "December 27, 2014" when they meant to say December 17, 2014, (Doc. 200 at 12 n.6), undermining their argument that they have it right and Plaintiff has it wrong. In that same brief, the caption trails off after naming only two Defendants. (*Id.* at 1.) The Court expects more from the New York Attorney General's Office.

Finally, as explained in further detail below, County Defendant failed to comply with Local Rule 56.2.

[4] Plaintiff filed a "List of Disputes to State Defendants' 56.1 Statement," (Doc. 210) and a "List of Disputes to County Defendant's 56.1 Statement," (Doc. 209). But neither of these documents complies with Federal Rule of Civil Procedure 56 or Local Rule 56.1. In most cases, these failures would be grounds for the Court to disregard Plaintiff's filings, but because Defendants failed to properly give *pro se* Plaintiff notice of their motions and what he would need to do to properly respond, the Court will not disregard Plaintiff's filings.

Federal Rule of Civil Procedure 56(c) provides:

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record . . .; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Local Rule 56.1 provides that "[e]ach statement by the . . . opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."

The Local Rules also require "[a]ny represented party moving for summary judgment against a party proceeding *pro se*" to "serve and file as a separate document, together with the papers in support of the motion, the following 'Notice To Pro Se Litigant Who Opposes a Motion For Summary Judgment' with the full texts of Fed. R. Civ. P. 56 and Local Civil Rule 56.1 attached." Local Rule 56.2. Generally, "[p]ro se litigants are . . . not excused from meeting the requirements of Local Rule 56.1" where the opposing party notifies the *pro se* litigant of

sentenced on September 12, 2012, to a two-year determinate term of imprisonment and a one-

year term of post-release supervision ("PRS").  (*Id.*)  His maximum expiration date ("MED") on

that determinate sentence was May 6, 2014.  (Doc. 188 at 2.)  Plaintiff was released from prison

on January 22, 2014, and commenced his one year of PRS under the supervision of the New

York State Department of Corrections and Community Supervision ("DOCCS").  (State Ds' 56.1

¶ 7.)  At that time, 104 days of his determinate two-year sentence (representing the period

between his release on January 22, 2014, and his MED of May 6, 2014) were held in abeyance.

(Doc. 188 at 2.)  The MED of his term of PRS was January 22, 2015.  (*Id.*)

On October 17, 2014, police officers observed Plaintiff trespassing, after which he was

arrested, and early on October 18, they issued him a desk appearance ticket charging him with

criminal trespass and criminal possession of a controlled substance.  (P's 56.1 ¶¶ 9, 11.)[5]

---

Local Rule 56.1's requirements."  *Wali v. One Source Co.*, 678 F. Supp. 2d 170, 178 (S.D.N.Y. 2009).  But here, neither the State Defendants nor the County Defendant seem to have provided Plaintiff proper notice of Local Rule 56.1's requirements.  The State Defendants' electronically filed notice did not include the full texts of either Federal Rule 56 or Local Rule 56.1, (Doc. 176), although the courtesy hard copy provided to chambers did (albeit in barely legible form), and thus the Court cannot tell if the version provided to Plaintiff was complete.  The Court can tell, however, that the State Defendants did not comply with their obligation to serve *and file* a proper Local Rule 56.2 notice.  The County Defendant provided only the text of the Federal Rule, (Doc. 187).  These derelictions are shocking because (1) the Local Rules tell parties verbatim what to send to a *pro se* litigant and file, and could not be more clear, yet both State Defendants and County Defendants failed to comply with the rule; and (2) the State and County are frequently sued by *pro se* prisoners, and one would imagine that they would know how to comply with the Local Rules regarding these types of motions.  Accordingly, the Court does not fault Plaintiff for failure to comply with the Local and Federal Rules here, and certain of his assertions and disputes will be considered even if they do not comply with the Rules.

[5] State Defendants object to the statement in paragraph 11 – that the trespass occurred on October 17 and the ticket was issued on October 18 – as "immaterial to the issues in this action," (State Ds' 56.1 Resp. ¶ 11), but the Court disagrees.  First, State Defendants do not and apparently have no basis to dispute the truth of Plaintiff's statement, as the arrest report generated for the incident indicates that Plaintiff was observed trespassing on October 17 but was not issued his desk appearance ticket until October 18.  (P's 56.1 Ex. 1.)  Second, State Defendants dispute the entire statement – that Plaintiff committed the trespass on October 17 and

"Plaintiff was released and told to bring his 'desk appearance ticket' to the White Plains

Courthouse[] on November 13th, 2014." (*Id.* ¶ 10.)  Plaintiff did not report his arrest to his

parole officer as required, but DOCCS was notified of the arrest through an "Alerts System."

(State Ds' 56.1 ¶¶ 11-12; Doc. 179 ("Keane Decl.") Ex. C.)  Plaintiff's crimes and his failure to

report the arrest to his parole officer constituted two separate violations of his parole.  (State Ds'

56.1 ¶¶ 13-14.)

On October 22, 2014, DOCCS issued a parole violation warrant for Plaintiff, (*id.* ¶ 16),

and he was declared delinquent as of October 17, 2014, (*id.* ¶ 15).  On October 29, 2014, parole

officers arrested Plaintiff, and he was taken to the Westchester County Jail ("WCJ"), which is

part of the Westchester County Department of Correction ("WCDOC").  (*See id.* ¶ 17; County

---

was ticketed on October 18 – yet they also put in their 56.1 Statement that Plaintiff committed
the crimes on October 17, 2014, (State Ds' 56.1 ¶ 10), and was arrested on October 18, 2014, (*id.*
¶ 9), acknowledging that they too understand that the dates are relevant.  Finally, in a case in
which days in confinement are in dispute, this type of specificity is both relevant and useful, so
Defendants' dispute is rejected, and the Court accepts this entire statement as true.

State Defendants dispute a number of Plaintiff's 56.1 Statements, asserting that they are
"immaterial" or "not material" to the issues in this action.  (State Ds' 56.1 Resp. ¶¶ 6, 10-11, 17-
19, 27, 30-36, 40-47, 50-51, 53-55, 60, 63-65, 72-73, 75, 83-85, 93-94, 102-103, 105-106, 113-
120.)  Some of Plaintiff's 56.1 Statements were in fact immaterial.  (*See, e.g., id.* ¶ 6 (describing
circumstances leading up to Plaintiff's 2012 arrest, which are not material to the instant
dispute).)  But the majority of these "immaterial" statements are material, and many of them are
also included in State Defendants' 56.1 Statement.  (*Compare, e.g.*, P's 56.1 ¶ 18 (listing the
misdemeanors with which Plaintiff was charged in connection with his October 18 arrest), *with*
State Ds' 56.1 ¶ 20 (listing the misdemeanors with which Plaintiff was charged in connection
with his October 18 arrest).)  It is unclear why State Defendants believe certain facts are
immaterial when asserted by Plaintiff, but not immaterial when State Defendants assert them.
Additionally, many of Plaintiff's 56.1 Statements that State Defendants reject as immaterial are
plainly material.  (*See, e.g., id.* ¶ 30 (Plaintiff stating that he filed a grievance and cited to the
grievance, yet State Defendants said this statement was "not material").)  State Defendants'
conclusory assertions that certain statements made by Plaintiff are immaterial or not material are
rejected, and those statements will be treated as undisputed for the purposes of these motions.

D's 56.1 ¶ 4.)  As of October 17, 2014, Plaintiff had 97 days left on his term of PRS and also "owed" 104 days on his original Putnam County Sentence.

On November 13, 2014, Plaintiff was arraigned in the White Plains City Court, under docket number 14-2481.  (State Ds' 56.1 ¶ 21.)  He was charged with two misdemeanors: criminal trespass in the third degree and criminal possession of a controlled substance in the Seventh Degree.  (P's 56.1 ¶ 18.)

Between November 13 and January 7, 2015, Plaintiff appeared in White Plains City Court approximately four times.  (County D's 56.1 ¶ 5.)  On January 7, 2015, Plaintiff appeared before the Honorable Jo Ann Friia of the White Plains City Court.  (*See* Doc. 184-5 ("City Court Tr.").)[6]  Plaintiff pleaded guilty to criminal possession of a controlled substance in the seventh degree.  (*Id.* at 5:6-12.)  An assistant district attorney ("ADA") conducted the allocution when Plaintiff entered his plea.  (*Id.* at 5:4-5.)  The ADA asked:

> Do you understand you're going to be sentenced to ninety days incarceration?
>
> The court has no objection that sentence running concurrently with parole.
>
> There's also a mandatory state surcharge, and your privileges in New York – your driving privileges in New York will be revoked.

(*Id.* at 6:19-25.)  Before Plaintiff responded, Judge Friia corrected the ADA, explaining that Plaintiff's driving privileges would be suspended, not revoked.  (*Id.* at 7:1-4.)  Plaintiff and his counsel then conferred, and Plaintiff's counsel stated, "My client understands.  The only thing I want to add, judge, is this sentence is subject to time already served."  (*Id.* at 7:19-22.)  The judge responded, "Well, yes.  Automatically he'll get credit for time served as it applies to this

---

[6] In the mid-1990s, when Judge Friia was in private practice, she represented the undersigned for a house closing and will preparation.  As she is not a defendant or even a witness in this case, I see no reason I cannot preside.  *See generally* 28 U.S.C. § 455(a); *United States v. Yousef*, 327 F.3d 56, 169 (2d Cir. 2003).

docket. . . .   [I]t would be from the date that he was arraigned here going forward." (*Id*. at 7:23-8:4.)  The judge added, "I don't know if you were in custody on your parole violation or something else in between.  Then they may split it up, but that's the Department of Corrections, not this court." (*Id*. at 8:5-10.)  The judge then confirmed that she was satisfied with the voluntariness of Plaintiff's plea, and stated,

> This plea satisfies all charges on this docket, including criminal trespass, third.
>
> The sentence, as promised, ninety days in the Westchester County Penitentiary with credit for good time served.
>
> This court has no objection to our sentence being served concurrent with that of parole.
>
> As far as I know, the Department of Parole has – or a violation hearing has not yet been held; so, because this is a drug or drug driven crime, while you have no New York State license, your privileges are suspended.

(*Id.* at 8:17-9:7.)[7]

On January 7, 2015, the same day that the plea was entered, Judge Friia signed a time commitment that stated, "IT IS ADJUDGED THAT [Plaintiff] be imprisoned in the WESTCHESTER COUNTY JAIL for the term of 90D NINETY DAYS." (Keane Decl. Ex. F ("Time Commitment 1").)  The row below reads "TO BE SERVED:" and presumably is where the Court could indicate whether the sentence is to be served concurrently with or consecutive to another sentence, but it was left blank. (*Id.*)  There is, however, a handwritten note at the bottom, below the Judge's signature and initialed by her, that states, "Court has no objection to this sentence served concurrently with parole or parole violation." (*Id.*)  There is a second time commitment prepared for Plaintiff that is also dated January 7, 2015, and signed by Judge Friia.

---

[7] The sentence Judge Friia imposed on Plaintiff is referred to herein as the "City Sentence."

(Keane Decl. Ex. J ("Time Commitment 2").)  Time Commitment 2 states that the ninety-day sentence is "TO BE SERVED:  CONCURRENT," and in the remarks section, it states "SENTENCE TO RUN CONCURRENT WITH PAROLE VIOLATION."  (*Id.*)[8]

On January 8, 2015, "CO Gray" from the WCDOC provided Plaintiff with a "Computation of Sentence" form, which Plaintiff calls a "Sentence Calculation Tape."  (P's 56.1 ¶ 27; *id.* Ex. 7.)  The form listed that Plaintiff received a sentence of ninety days commencing January 7, 2015, with one day of "Jail Time Credit" for October 18, 2014, the date of his arrest. (*Id.* Ex. 7.)  Plaintiff's earliest release date was listed as March 6, 2015, if he received thirty days of good time credit, and if he had to serve his entire sentence, he would be released on April 3, 2015 (there was a two-day "Weekend Adjustment" in the calculation).  (*Id.*)

On January 23, 2015, Plaintiff filed a "Grievance Form," in which he stated his "time-computation [was] not correct," as it did not "reflect the 'concurrent' sentence the judge ordered."  (P's 56.1 Ex. 9.)  Plaintiff explained that he told a WCDOC employee of the error, but that he was told that it "'doesn't matter' what kind of sentence the judge or court imposed."  (*Id.*) Plaintiff alleged that Judge Friia had set bail on November 13, 2014, for the purpose of him "'getting credit' for the time from that day forward."  (*Id.*)[9]  Plaintiff requested "WCDOC to abide by the sentence imposed by Judge Friia."  (*Id.*)  Plaintiff's grievance was received on January 27, 2015.  (*Id.*)  The following day, a captain filled out a "Grievance Investigation Form," in which he concluded that the "time calculation is correct" because Plaintiff was not entitled to time from October 29, 2014 through January 6, 2015.  (*Id.* Ex. 10.)  On January 28,

---

[8] As discussed in greater detail below, the actual date that Time Commitment 2 was generated is in dispute.

[9] A setting of bail in the White Plains City Court would not result in Plaintiff's release from incarceration, because he was also held on the parole violation.

2015, the "Grievance Coordinator" concluded that Plaintiff's time was calculated correctly under N.Y. Penal Law 70.30.  (*See id.* Ex. 12.)  The Grievance Coordinator – who must have had access to Time Commitment 1 – explained that while the court had no objection to the sentence being served concurrently with his parole or parole violation, that was "not possible according to NYS penal 70.30," and thus Plaintiff could not receive credit from October 29, 2014, through January 6, 2015.  (*Id.*)[10]  Plaintiff's "grievance [was held to be] unsubstantiated and [his] remedy [was] denied."  (*Id.*)  Assistant Warden Karl Vollmer wrote a memorandum to Plaintiff dated January 29, 2015, explaining that Vollmer had reviewed the grievance and "sustain[ed] the decision made by the Grievance Coordinator."  (*Id.* Ex. 11.)  Plaintiff appealed the Grievance Coordinator's decision.  (*Id.* Ex. 12.)  WCDOC sent Plaintiff's appeal to the New York State Commission of Correction, which did not review Plaintiff's grievance until May 14, 2015, and did not issue its decision – affirming the Grievance Coordinator's decision – until June 22, 2015 (after Plaintiff was released).  (*Id.* Ex. 13.)

The same day that Plaintiff filed his Grievance Form – January 23 – he wrote a letter to Judge Friia.  (*Id.* Ex. 24.)  He explained that he thought his sentence was being calculated incorrectly and asked if Judge Friia could explain to WCDOC that his sentence was to run concurrently.  (*See id.* at 4-5.)  He stated that he had been told by a correction officer that a captain at the jail had said that if the Judge had set bail "for the exclusive purpose of giving [Plaintiff] credit," and if the Judge informed the jail that the time was "concurrent to parole," Plaintiff probably would get credit for the time from November 13, 2014 onward.  (*Id.*)  The letter is stamped "Received" as of February 10, 2015.  (*Id.* at 1.)

---

[10] The Grievance Coordinator did not state what subsection of N.Y. Penal Law § 70.30 applied.

On March 4, 2015, Plaintiff had his Final Parole Revocation Hearing in front of an administrative law judge ("ALJ").  (*Id.* Ex. 17 ("Parole Hearing Tr.").)  Plaintiff pleaded guilty to failure to notify his parole office of his arrest and police contact, and the remaining charges were dropped.  (*Id.* at 6:2-24; 8:16-9:3.)  Plaintiff's delinquency date was amended to be October 29, 2014, the date when he went into WCDOC custody for his parole violation, to give him "all his delinquent time back."  (*Id.* at 6:9-11, 9:6-11.)  The ALJ noted that the minimum sentence would ordinarily be one year, but that he could not give Plaintiff that much time because it exceeded the amount he "owed," which was the 104 days that had been held in abeyance on the Putnam County Sentence and the 85 days (October 29, 2014 to January 22, 2015) remaining on his term of PRS at the time he violated.  (*Id.* at 6:12-20; *see* Doc. 188 at 2.)[11]  The sentence would therefore be "a hold to M[aximum] E[xpiration]."  (Parole Hearing Tr. at 6:20.)  The ALJ asked Plaintiff, "We have a release date in the beginning of May, sometime in the beginning of May.  Okay?" to which Plaintiff responded, "Yes, sir."  (*Id.* at 8:2-5.)  The ALJ's written decision, signed on March 4, 2015 – the same day as the hearing – ordered that Plaintiff be held until his maximum expiration date.  (County D's 56.1 ¶ 12; Doc. 184 ("Cosgriff Decl.") Ex. 8 at 3-4.)

On or about March 8, 2015, Plaintiff's mother, Janet von Stein, called WCDOC to inform officers there that her son's sentence has been miscalculated.  (Doc. 207 ("Janet von Stein Decl." ¶ 3.)  She was referred to Defendant Pruyne's office and spoke with Pruyne's "secretary or receptionist."  (*Id.* ¶¶ 3-4.)  Plaintiff's mother explained that Judge Friia had ordered Plaintiff's sentences to run concurrently, but the WCDOC was implementing them consecutively.  (*See id.*

---

[11] Because the delinquency date is when the clock stops on service of PRS, the adjustment from October 17 to October 29 meant that Plaintiff had eighty-five days remaining on PRS rather than ninety-seven.

¶ 4.)  After putting Plaintiff's mother on hold, possibly to confer with Pruyne, Pruyne's secretary or receptionist told Plaintiff's mother that Pruyne would not be able to speak with her and that she should put her request in writing.  (*See id.* ¶ 5.)  On March 9, 2015, Plaintiff's mother sent a Freedom of Information Law ("FOIL") request to Pruyne "requesting the official time calculations used to determine the length of sentence and amount of jail time credited from October 29, 2014 for Christopher von Stein."  (Cosgriff Decl. Ex. 10.)  On March 12, 2015, Pruyne responded to Plaintiff's mother, denying her request and stating that FOIL "does not obligate a covered agency to create documents not already in existence" and that "jail time calculations are only provided to inmates directly, or to their designated counsel."  (*Id.* Ex. 12.) Pruyne suggested that Plaintiff request the information himself.  (*Id.*)

On March 11, 2015, WCDOC received a "Parole Revocation Certificate of Disposition" from the New York State Board of Parole, which indicated that Plaintiff's parole had been revoked and he was to return to DOCCS's custody, where he would be held until his assessed expiration date of May 7, 2015.  (Cosgriff Decl. Ex. 11.)  It also instructed WCDOC that if Plaintiff was "not subject to any additional holds," he should be promptly returned to DOCCS. (*Id.*)  From Plaintiff's arrest on October 29, 2014, through March 15, 2015, Plaintiff was in WCDOC custody.

On March 16, 2015, Plaintiff was transferred from the WCJ under WCDOC's custody to Downstate Correctional Facility ("Downstate") under DOCCS's custody.  (P's 56.1 ¶ 54; State Ds' 56.1 ¶ 32.)  By this time, Plaintiff had completed the ninety-day sentence Judge Friia had imposed on him, having served sixty days and received good time credit for the remaining thirty. (P's 56.1 ¶ 55; State Ds' 56.1 ¶ 31.)  When DOCCS received Plaintiff, Defendant Pamela Rivera, an Agency Program Aide at Downstate, was in charge of calculating Plaintiff's maximum

expiration date.  (*See* Doc. 180 ("Rivera Decl.") ¶¶ 1-2, 26, 32-34.)  When calculating Plaintiff's

sentence, Rivera did not have the "White Plains City Court disposition," so she "presumed [the

sentence] to be consecutive."  (*Id.* ¶ 31.) [12]  In doing so, she relied on N.Y. Penal Law § 70.25(1),

which provides that if a sentencing court (here, Judge Friia) does not specify the manner in

which a determinate sentence is to run in relation to a prior sentence (here, the 2012 Putnam

County Sentence), the sentences shall run consecutively.  (Rivera Decl. ¶ 29 (citing N.Y. Penal

Law § 70.25(1).)  The DOCCS computerized database indicated that Plaintiff was to be held to

his MED on the parole violation, and his computerized rap sheet indicated that he had served

sixty days on a ninety-day local sentence, (State Ds' 56.1 ¶¶ 37-38; Rivera Decl. ¶¶ 24, 27),[13] but

there is nothing in the record to suggest that Rivera or any other State Defendant made any effort

to get Judge Friia's disposition or otherwise determine whether the terms were consecutive or

concurrent, (P's 56.1 ¶ 60).[14]  This was despite the fact that Item 9423 of the New York State

Division of Parole Manual ("Parole Manual") provides that the first step in verifying credited

time is to "review the Sentence and Commitment Order and/or Jail Time Certificate in the

inmate's case folder/record for accuracy."  (Rivera Decl. Ex. A at 2.)

---

[12] She presumably also did not have either Time Commitment or the New York State
Board of Parole Certificate of Disposition.

[13] Plaintiff disputes that there is evidence that the database showed he had served sixty
days of the ninety-day sentence, (P's 56.1 Resp. to State Ds ¶ 38), but he has provided no
evidence refuting Rivera on the point.  His objection is puzzling, because Rivera's admitted
knowledge of the sixty-day sentence, and her failure to inquire further, only helps Plaintiff's
case.  In any event, whether I accept this fact as true makes no difference to the outcome.

[14] State Defendants "object to this statement because it is not material to the issues in this
action, as DOCCS has no legal obligation to obtain an 'absent Time Commitment/Disposition.'"
(State Ds' 56.1 Resp. ¶ 60.)  But, as discussed in greater detail below, there is such a legal
obligation under certain circumstances, and thus this statement is material to the issues here.

The only paper accompanying Plaintiff when he went into DOCCS custody was his "Parole Retaking Warrant." (State Ds' 56.1 ¶ 36; Rivera Decl. ¶ 22; *id.* Ex. C.)[15]  The Parole Retaking Warrant said nothing about the length of the sentence or whether his parole violation and City Sentence were to run concurrently or consecutively.  Rivera was able to electronically access the ALJ's written decision (*compare* Cosgriff Decl. Ex. 8 (ALJ's written decision), *with* Rivera Decl. Ex. B (same written decision, which Rivera attested was contained in DOCCS's electronic database)), indicating that Plaintiff was guilty of parole violations and had been sentenced to serve in DOCCS custody until his maximum expiration date, but it also said nothing about whether the sentence was concurrent or consecutive, (Rivera Decl. ¶ 24; *id.* Ex. B).  Rivera did not obtain, nor did she attempt to obtain, Time Commitment 1 (with its reference to Judge Friia not objecting to concurrent time) or the Parole Revocation Certificate of Disposition (with the May 7 release date), both of which were in the hands of WCDOC prior to Plaintiff's transfer to Downstate.

After reviewing DOCCS's online database and interpreting the relevant New York statutes and the Parole Manual, (*see id.* ¶¶ 5, 28, 34), Rivera issued a "Parole Jail Time Certificate," or "PJTC," which credited toward Plaintiff's parole sentence eighty-nine days for the time he served from December 17, 2014, until March 15, 2015, while in WCDOC custody. (*id.* ¶¶ 32; *id.* Ex. D).  Rivera used October 17, 2014, as Plaintiff's delinquency date,[16] but she

---

[15] Plaintiff disputes this fact as contradicted by State Defendants' 56.1 ¶ 34, (P's 56.1 Resp. to State Ds ¶ 36), but nothing in that paragraph contradicts this fact.

[16] State Defendants created confusion regarding whether the delinquency date Rivera used in her calculation was October 17 or October 18. (*Compare* State Ds' 56.1 ¶ 15 ("Plaintiff was declared delinquent by DOCCS as of October 17, 2014), *with id.* ¶ 43 ("State Defendant Rivera calculated that Plaintiff should be credited with time from his initial delinquency – his arrest by the White Plains Police Department on October 18, 2014 through his return to DOCCS on March 15, 2015 . . . .").  Based on this inconsistency, Plaintiff argues that it shows that Rivera

did not count the sixty days between October 17 and December 16 toward his parole sentence,

because she credited that time against his presumably-consecutive City Sentence, which is how

she ended up using December 17 as the starting date for the time he already served.  (State Ds'

56.1 ¶¶ 44-45.)  Rivera calculated that the time frame of October 17, 2014 and March 15, 2015 is

149 days.  By Rivera's calculation – which credited Defendant with serving all of that time in

WCDOC, even though he had not actually been taken into custody until October 29, 2014[17] –

sixty of those days were credited toward the White Plains sentence, leaving 89 days that were not

otherwise credited and which she therefore applied to the time Plaintiff owed on the ALJ's

---

had access to Plaintiff's sentencing documents prepared by Judge Friia, as it could be only
through those documents that Rivera would have known of the October 18 date.  (See, e.g., P's
56.1 Resp. to State Ds ¶¶ 44-47; P's 56.1 Corrections at 1.)  But this confusion is brought on
only because of State Defendants' counsel's inconsistencies, not by anything Rivera herself has
done or said.  Rivera was consistent in her declaration and in the PJTC that October 17 was the
original delinquency date (and that it was adjusted to October 29 by the ALJ).  (Rivera Decl.
¶¶ 14-15, 18; id. Ex. D.)  Nowhere in the record can the Court find Rivera using the October 18
date, and State Defendants' 56.1 Statements to that end are erroneous.  It also unravels Plaintiff's
theory that Rivera's use of the October 18 date means that she had access to Judge Friia's
sentencing documents.

    Plaintiff also argues that Rivera's use of March 15 instead of March 16 as the last day
that Plaintiff was in WCDOC custody, (P's 56.1 Corrections at 1), means that Rivera actually
used October 18 instead of October 17 as Plaintiff's delinquency date, which he again says
shows that Rivera  had access to Judge Friia's ruling.  First, the Court does not follow this logic.
March 16 was Plaintiff's first day in DOCCS's custody, so considering March 15 as Plaintiff's
last day in WCDOC custody makes sense.  Indeed, any other method would deprive Plaintiff of a
day's credit.  Second, Rivera attested that she used October 17, not October 18, as the
delinquency date in calculating Plaintiff's jail time credit, and Plaintiff's unsubstantiated theories
as to why Rivera is wrong are insufficient to create a factual dispute.

    [17] It is undisputed that Rivera did not use October 29 as Plaintiff's delinquency date,
despite that being the day that he was arrested and taken into custody on the parole violation, and
despite the fact that she was aware the delinquency date had been adjusted to October 29 from
October 17.  (Rivera Decl. ¶ 18; id. Ex. D.)  Instead, Rivera went back further in time to credit
Plaintiff with time that he did not actually serve (that is, from October 17 until October 29).  (See
State Ds' 56.1 ¶ 44; P's 56.1 ¶ 70.)  Had she used October 29, he would have been credited with
seventy-seven rather than eighty-nine days.  Plaintiff argues that Rivera giving him twelve extra
days shows her feelings of guilt over not treating the sixty-day White Plains sentence as
concurrent, (P's 56.1 ¶ 70), but this allegation is pure speculation, not to mention illogical.

sentence.  Rivera determined that, with 89 days credited toward the 189 days Plaintiff owed on

that sentence, Plaintiff had 100 days left to serve, which, pursuant to Rivera's calculation,

brought his MED to June 24, 2015.  (Rivera Decl. ¶¶ 25-33.)

Plaintiff was provided with Rivera's PJTC, and while he believed that the calculation was

erroneous, he had no access to envelopes or stamps while at Downstate and thus could not write

a letter to that end.  (P's 56.1 ¶¶ 71, 73.)

On March 27, 2015, Plaintiff was transferred from Downstate to Mid-State Correctional

Facility ("Mid-State").  (State Ds' 56.1 ¶ 53.)  When Plaintiff arrived at Mid-State, an officer

conducted an "initial interview," during which Plaintiff complained that his maximum expiration

date should be earlier than June 24 and that he would attempt to have the sentencing court send

documents to the facility to prove as much.  (P's 56.1 ¶ 75; *id.* Ex. 23.)

Plaintiff states that on April 10, 2015, he wrote a letter to Eileen Byrne, the White Plains

City Court Clerk, requesting a copy of the disposition of his City Sentence.  (*Id.* ¶ 76.)  Plaintiff

does not have a copy of this letter, but a follow-up letter Plaintiff sent to Byrne on May 28, 2015,

in which Plaintiff refers to a previous letter he had sent, (*id.* Ex. 26), suggests that Plaintiff's

account is correct.

Plaintiff also wrote a letter to Defendant Pruyne on April 10.  (County D's 56.1 ¶ 23; P's

56.1 Ex. 28.)  In the letter, Plaintiff explained that his City Sentence was to run concurrently with

his parole violation, but "[f]or some reason or another, Westchester County Jail did not run the

sentences concurrent[ly]."  (P's 56.1 Ex. 28 at 2.)  Plaintiff further explained that his lawyer, the

ALJ, and his parole officer had told him that he would be released on May 7, but when he got to

Downstate, he was told he would not be released until June 24.  (*Id.*)  Plaintiff explained that he

was in the process of trying to get Judge Friia's disposition, but he was concerned that WCDOC

15

had committed the error that caused his sentence miscalculation.  (*Id.* Ex. 28 at 3.)  Plaintiff

wrote that he believed Pruyne had the "best 'bird's eye' of what error has occurred," so asked for

Pruyne to help.  (*Id.*)

> On April 21, 2015, Pruyne responded:
>
> In response to your request for information, a review of WCDOC records indicates that you were arrested on October 10, 2014 for violating the terms of your parole. On November 13, 2014, the White Plains Police Department lodged a warrant and, ultimately, you were sentenced to a 90-day period of incarceration on these local charges (which sentenced [*sic*] commenced on January 7, 2015).  You may wish to consider contacting the New York State Division of Parole regarding the parameters of your parole violation.

(*Id.* Ex. 29.)[18]

In April 2015, Plaintiff also made complaints to DOCCS staff.  On April 21, Plaintiff

wrote a letter to Defendant Lissa Graveline, the Inmate Records Coordinator at Mid-State.  (P's

56.1 ¶ 87; *id.* Ex. 32; *see* Doc. 181 ("Graveline Decl.") ¶¶ 1, 3.)  In the letter, Plaintiff explained

that he was "certain Judge Ann Friia" said on the record that his City Sentence was to run

concurrently with his parole violation.  (P's 56.1 Ex. 32 at 2.)  Plaintiff explained that he had

requested his disposition from the White Plains City Court, but he asked if Graveline could

"correct this mistake . . . hopefully before May 7," because he thought that Graveline may be in

the best position to help him.  (*Id.* Ex. 32 at 2-3.)  On April 23, Plaintiff also wrote a letter to

---

[18] Prior to sending the letter to Plaintiff, Pruyne sent a draft of the text (created by a subordinate) to his "Captains," asking for their thoughts.  (P's 56.1 Ex. 30 at 3.)  The initial version Pruyne sent included the following sentence:  "Because a parole violation is not applied concurrent to a local sentence, you may wish to consider contacting the New York State Division of Parole regarding the parameters of your parole violation."  (*Id.*)  One of the captains, however, suggested Pruyne remove the clause about parole violations running concurrent with parole violations, which Pruyne did prior to sending the letter to Plaintiff.  (*Id.*)  The record contains no explanation for the reference to "October 10, 2014," and it appears to be a typographical error.

Offender Rehabilitation Counselor at Mid-State, non-Defendant Larry Zick, explaining the perceived miscalculation of his sentence.  (*Id.* Ex. 38.)

On April 29, Graveline responded to Plaintiff with a memorandum.  (*Id.* Ex. 33; Graveline Decl. ¶ 4.)  Graveline explained that Plaintiff's maximum expiration date was June 24, 2015, as he was credited with eighty-nine days.  (P's 56.1 Ex. 33.)  She said that if Plaintiff "feel[s] this is incorrect, [he] should write to Community Supervision here at Midstate."  (*Id.*)

On May 5, 2015, Plaintiff's lawyer, Doug Taub, wrote a letter to Zick, requesting that DOCCS recalculate Plaintiff's sentence because Judge Friia had intended Plaintiff's City Sentence to run concurrently with his parole violation.  (*Id.* Ex. 39.)  Taub attached the sentencing minutes to his letter.  (*See id.*)  On May 13, Zick forwarded Taub's letter and the sentencing minutes to Graveline.  (State Ds' 56.1 Resp. ¶ 93.)

On May 13, Graveline issued a memorandum to Plaintiff.  (P's 56.1 Ex. 34.)  Graveline stated that she reviewed the sentencing minutes and they "do indicate that your 90 day sentence is to run concurrent with parole."  (*Id.*)[19]  She added, "This means your 90 day sentence is satisfied by the service of your sentence you are currently serving in NYSDOCCS.  As I stated before[,] your sentence is recalculated when you come back to NYSDOCCS . . . ."  (*Id.*)  Graveline then concluded that Plaintiff's maximum expiration date had "been reviewed" and was "in accordance with New York State Penal Law," and that "[t]here is nothing further [Graveline]

---

[19] Graveline seems to suggest in her declaration that she made an error in her May 13 memorandum, and that in fact the sentencing minutes that she reviewed did "not indicate[] that the sentencing judge pronounced a sentence to run concurrently with parole."  (Graveline Decl. ¶ 9.)  But she also attested, without further explanation, that she meant in her letter "that even if his 90-day 2015 City Sentence was to run concurrently with his 2012 State Sentence, the computation, by my calculation was correct, in any event."  (*Id.* ¶ 8.)

can do." (*Id.*)  Graveline added that if Plaintiff had any questions, he could write to the Office of Sentencing Review in Albany, New York.  (*Id.*)

On May 15, 2015, Plaintiff sent two more letters trying to get his sentence recalculated. The first was a seven-page letter, received by Graveline, in which Plaintiff provided a detailed account of why he believed his release date had been miscalculated.  (P's 56.1 ¶ 96; *id* Ex. 35.)[20] Plaintiff explained that every time he tried to have his release date recalculated, the person with whom he communicated indicated that there was nothing he or she could do, and the complaint would be forwarded to another department that was similarly unhelpful.  (*See id.* at 2.) Plaintiff's second letter was sent to Defendant Lisa Hoy, a Parole Specialist at Mid-State, (Doc. 182 ("Hoy Decl." ¶ 1)), in which Plaintiff asked "what parole's position is on alleged errors made on an inmate's Parole Jail Time Certificate," (P's 56.1 Ex. 37 at 5.)

On May 19, Graveline responded to Plaintiff's May 15 letter.  (*Id.* Ex. 36.)  She explained that she "can only credit [Plaintiff] with the amount of parole jail time that is on [his] parole jail time certificate."  (*Id.*)  She stated that she "d[id] not have the authority to change the amount of parole jail time credit [Plaintiff has]."  (*Id.*)  Graveline told Plaintiff that if he thought the credit he received was incorrect, he needed to contact parole to have his dates recalculated. (*Id.*)  Thus, once again, Plaintiff received a response from a Defendant explaining that there was nothing that Defendant could do for him, and he had to contact someone else.

---

[20] Plaintiff states that he sent the letter to Graveline, among others, but State Defendants seemingly dispute this fact, noting that the letter is not addressed to anyone in particular.  (State Ds' 56.1 Resp. ¶ 96.)  But whether the letter was addressed to Graveline is irrelevant because Graveline received the letter and responded to it a few days later.  (P's 56.1 Ex. 36.)

Hoy did not respond to Plaintiff's May 15 letter.  (P's 56.1 ¶ 101.)[21]  On May 22, Plaintiff wrote another letter to Hoy, this time asking for an in-person meeting.  (*Id.* Ex. 40.) Plaintiff explained that he had spoken with Zick about his release-date calculation and that Zick tried to contact Plaintiff's lawyer to request a revised disposition from the White Plains City Court but had not received a response.  (*Id.*)

Hoy wrote back to Plaintiff on the bottom of his letter.  (*Id.*)  She explained that Plaintiff would need "an official disposition (sentence + commitment) from the court stating said sentence to run concurrently with parole time owed.  This is your responsibility to obtain.  Mr. Zick will not be contacting your lawyer again.  He has more than adequately assisted you." (*Id.*)  Hoy did not explain why it was Plaintiff's responsibility.

On May 28, 2015, Plaintiff wrote another letter to Byrne, the clerk of the White Plains City Court.  (P's 56.1 Ex. 26.)  Plaintiff indicates in the letter that he had previously written Byrne and received a response from her.  (*See id.*)  It appears, based on the May 28 letter, that Byrne had sent Plaintiff a copy of his disposition, but the copy did not include the word

---

[21] State Defendants dispute this statement, arguing that "it contains assertions that are not substantiated by the references to any evidence that State Defendant Hoy received . . . Plaintiff's May 15, 2015 letter to her."  (State Ds' 56.1 Resp. ¶ 101.)  This fails to raise a dispute of fact. State Defendants admitted that Plaintiff sent Hoy a letter on May 15, (*Id.* ¶ 97), and absent evidence to the contrary, there is a presumption that a letter sent was received by the intended recipient, *see Dunn v. Albany Med. Coll.*, 445 F. App'x 431, 432-33 (2d Cir. 2011) (summary order).  Because Hoy "d[oes] not have any independent recollection" of the facts underlying this case, (Hoy Decl. ¶ 3), she could not credibly testify as to whether or not she received the letter, and thus Plaintiff's statement the he sent it to her is unchallenged.  *See Kennedy v. City of N.Y.*, 570 F. App'x 83, 84 (2d Cir. 2014) (summary order) ("[L]ack of recollection[] is not sufficient to contradict [Plaintiff's] testimony, or to raise a genuine dispute of fact.").  Accordingly, for the purposes of this motion, the Court accepts as true that Hoy received and failed to respond to Plaintiff's May 15 letter.

"concurrent" on it.  (*See id.*)  Plaintiff thus asked for Byrne to send him a "revised" disposition, indicating that the sentence was to run concurrently.  (*Id.*)

On June 2, 2015, "Byrne created another . . . Disposition," (State Ds' 56.1 Resp. ¶ 107; *see* Doc. 196-7), which was received at Mid-State on June 5, (State Ds' 56.1 ¶ 65; Keane Decl. Ex. H.)  This disposition indicated that the court "ha[d] no objection" to the City Sentence being served concurrently with the parole violation.  (Keane Decl. H.)

On June 8, 2015, DOCCS received a fax from Taub with Time Commitment 2.  (P's 56.1 ¶ 109; Time Commitment 2.)[22]  As noted, Time Commitment 2 states that the City Sentence was to run concurrently with the parole violation.  (Time Commitment 2.)  The same day that DOCCS received Time Commitment 2, it forwarded it to the Office of Sentencing Review.  (State Ds' 56.1 ¶ 69.)  On June 9, Tami Cafariella, a DOCCS employee, issued a new PJTC crediting Plaintiff with 138 days of jail time (October 29, 2014 to March 15, 2015) prior to his transfer to DOCCS, as opposed to the 89 days that had been previously calculated.  (*See* Doc. 183 at 41.)

On June 10, 2015, Plaintiff was released from custody.  (State Ds' Resp. ¶ 111.)

## B.  **Procedural History**

Plaintiff filed an Amended Complaint on July 7, 2017, naming the current Defendants as well as a few other individual Defendants.  (Doc. 26.)  The Defendants moved to dismiss, and after considering the motions, the Court allowed the claims against Defendants Pruyne, Rivera,

---

[22] State Defendants assert that the fax came from the White Plains City Court, (State Ds' 56.1 ¶ 67), but State Defendants admitted in response to Plaintiff's 56.1 Statement that the fax was sent by Plaintiff's counsel Taub, (State Ds' 56.1 Resp. ¶ 109), and the fax itself lists that it was sent by "Doug Taub Esquire," (Time Commitment 2).  Accordingly, the record establishes that the fax was sent by Plaintiff's counsel, not the White Plains City Court.

Graveline, and Hoy to proceed, while the remaining defendants were dismissed.  (Minute Entry

dated Aug. 30, 2017).  Pruyne and State Defendants subsequently answered.  (Docs. 73, 75.)

After numerous discovery disputes and requests for extensions, the parties submitted pre-

motion letters, (Docs. 139-141, 145), and the Court held a pre-motion conference, (Minute Entry

dated Jan. 17, 2019).  After both sides requested, and the Court granted, numerous extensions,

State Defendants and County Defendant filed their motions for summary judgment on September

19, 2019, and filed memoranda of law in support, (Docs. 194 ("State Ds' Mem."), 185 ("County

D's Mem.")), and on December 6, 2019, Plaintiff filed his cross-motion for summary judgment

and memorandum of law in support, which also appeared to be an opposition to Defendants'

motions, (Doc. 208 ("P's Mem.")).  State Defendants and County Defendant opposed Plaintiff's

motion, (Docs. 200 ("State Ds' Opp."), 192 ("County D's Opp."), and Plaintiff filed what he

fashioned as sur-replies to State and County Defendants, (Docs. 201, 211.)

## II.    LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that

a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit

under the governing law . . . .  Factual disputes that are irrelevant or unnecessary will not be

counted."  *Id.*  On a motion for summary judgment, "[t]he evidence of the non-movant is to be

believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.

The movant bears the initial burden of demonstrating "the absence of a genuine issue of

material fact," and, if satisfied, the burden then shifts to the non-movant to "present evidence

sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.  Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and he "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks omitted).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1).  Where an affidavit is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated." *Id.* 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008).  In the event that "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it."  Fed. R. Civ. P. 56(e).

Where, as here, the Court simultaneously is considering multiple motions for summary judgment, the Court applies the same summary judgment standard as that used for deciding

individual motions for summary judgment. *See Penguin Group (USA) Inc. v. Steinbeck*, 537 F.3d 193, 200 (2d Cir. 2008) (explaining that facts must be construed in the light most favorable to the non-moving party for each cross-motion for summary judgment); *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) ("[E]ach party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration."). Where the motion and cross-motion seek a determination of the same issue, however, the Court may address them together. *See Royal & Sun All. Ins., PLC v. E.C.M. Transp., Inc.*, No. 14-CV-3770, 2015 WL 5098119, at *2 (S.D.N.Y. Aug. 31, 2015); *Chartis Seguros Mex., S.A. de C.V. v. HLI Rail & Rigging, LLC*, 3 F. Supp. 3d 171, 179 (S.D.N.Y. 2014).[23]

*Pro se* litigants must be afforded "special solicitude," *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010), "particularly where motions for summary judgment are concerned," *Jackson v. Fed. Express*, 766 F.3d 189, 195 (2d Cir. 2014).

## III.   DISCUSSION

Plaintiff states he is bringing claims under 42 U.S.C. § 1983 for alleged violations of the Fourth, Eighth, and Fourteenth Amendments. (P's Mem. at 1.) As I explained in my ruling on the motions to dismiss, however, because the detention of which Plaintiff complains occurred as part of the punishment stemming from his 2012 conviction for assault and his 2015 conviction for criminal possession of a controlled substance, I consider his unlawful detention claim to be brought under the Eighth Amendment, not the Fourth. This is consistent with the majority of decisions in this circuit. *See Francis v. Fiacco*, No. 15-CV-901, 2018 WL 1384499, at *6 (N.D.N.Y. Mar. 16, 2018) (collecting cases), *rev'd and remanded on other grounds*, 942 F.3d

---

[23] The Court will mail copies of all unpublished opinions cited herein to Plaintiff.

126 (2d Cir. 2019); *see also Brown v. Doe*, 2 F.3d 1236, 1242 n.1 (2d Cir. 1993) ("Where the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment. . . .  After conviction, the Eighth Amendment serves as the primary source of substantive protection in cases where the deliberate use of force is challenged as excessive and unjustified.") (internal quotation marks, alterations, and citations omitted); *Turner v. White*, 443 F. Supp. 2d 288, 292-93 (E.D.N.Y. 2005) ("In most instances, the right involved will be either the Fourth Amendment or the Eighth Amendment," and "where an individual has been convicted of a crime and seeks to challenge the conditions of confinement . . . the claim is analyzed as a violation of the Eighth Amendment's prohibition on cruel and unusual punishment.") (internal quotation marks omitted).

Plaintiff may, however, simultaneously maintain an Eighth Amendment deliberate indifference claim and a Fourteenth Amendment due process claim.  *See Peterson v. Tomaselli*, 469 F. Supp. 2d 146, 162 (S.D.N.Y. 2007) ("Plaintiff's claim of improper confinement sounds in the Eighth Amendment and the Due Process Clause as applied to states through the Fourteenth Amendment."); *see also Francis*, 942 F.3d at 141-51 (analyzing those two claims together under similar factual circumstances).  Accordingly, the Court construes Plaintiff's Amended Complaint as bringing § 1983 claims arising under the Eighth and Fourteenth Amendments, but not the Fourth Amendment.

### A.   <u>Personal Involvement</u>

Before reaching the merits of Plaintiff's § 1983 claims, the Court must first determine whether Plaintiff can establish that Defendants were personally involved in the alleged violation of his rights.  "It is well settled in this Circuit that personal involvement of defendants in alleged

constitutional deprivations is a prerequisite to an award of damages under § 1983," *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (internal quotation marks omitted), and thus "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution," *Thomas v. Venditto*, 925 F. Supp. 2d 352, 363 (E.D.N.Y. 2013) (internal quotation marks omitted).  Personal involvement "is a question of fact."  *Grullon v. City of New Haven*, 720 F.3d 133, 140 (2d Cir. 2013) (internal quotation marks omitted).

Under *Colon v. Coughlin*, 58 F.3d 865 (2d Cir. 1995), the personal involvement of a supervisor may be shown in one of five ways:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

58 F.3d at 873.  "Although the Second Circuit has yet to speak definitively, there is a strong argument that . . . supervisory liability may be predicated only on direct involvement in the constitutional violation or creation of a policy that sanctioned it."  *Phillips v. City of Middletown*, No. 17-CV-5307, 2018 WL 4572971, at *8 n.7 (S.D.N.Y. Sept. 24, 2018); *see Bellamy v. Mount Vernon Hosp.*, No. 07-CV-1801, 2009 WL 1835939, at *6 (S.D.N.Y. June 26, 2009) ("Only the first and part of the third *Colon* categories pass *Iqbal*'s muster," referring to *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)), *aff'd*, 387 Fed. App'x 55 (2010) (summary order).  But whether all five *Colon* factors can still be used to establish personal involvement is irrelevant here, as Plaintiff has established here at a minimum that there are factual disputes regarding whether each Defendant was directly personally involved under either test.

"The general rule is that if an official receives a letter from an inmate and passes it on to a subordinate for response or investigation, the official will not be deemed personally involved with respect to the subject matter of the letter," but where "the official does personally look into the matters raised in the letter, or otherwise acts on the prisoner's complaint or request, the official may be found to be personally involved." *Rivera v. Fischer*, 655 F. Supp. 2d 235, 238 (W.D.N.Y. 2009); *see Eldridge v. Williams*, No. 10-CV-423, 2013 WL 4005499, at *5 (S.D.N.Y. July 30, 2013). Indeed, "[a] defendant's personal receipt of a complaint or letter and subjective awareness of the alleged unconstitutional conditions may be one factor that helps establish personal involvement." *Eldridge*, 2013 WL 4005499, at *5. And where an official responds to a plaintiff's letter but fails to subsequently remedy the alleged unconstitutional violation, "there is sufficient evidence to establish [that official's] personal involvement with regards to [the plaintiff's] claims." *Id.* at *6.

Pruyne contends that he was not personally involved in the alleged constitutional violations, arguing first that he received only one letter from Plaintiff, to which he promptly responded, and second that he did not have the authority to remedy the alleged violation. (County D's Mem. at 10-13.) Pruyne's first argument is rejected. He received a phone call from Plaintiff's mother on about March 8, 2015, and giving Plaintiff the benefit of every inference, Pruyne learned from his assistant that Plaintiff believed his sentences had been improperly calculated. Pruyne then got a letter from Plaintiff's mother, dated the next day, asking for documentation as to Plaintiff's jail time credit calculations, which he would have connected to the call of the previous day. Days later, Pruyne responded that Plaintiff needed to make the request himself. (Cosgriff Decl. Ex. 12.) The following month Plaintiff wrote a letter to Pruyne, which Pruyne clearly read and into which he personally looked, as he conferred with his

26

subordinate and his "Captains" to determine the appropriate response.  (P's 56.1 Exs. 28-30; *see* County D's Opp. at 6 (suggesting that Pruyne promptly investigated and responded to Plaintiff's letter).)  A "prompt response," (County Opp. at 6), does not shield Pruyne from liability, because his response and subsequent actions did nothing to remedy the constitutional violations.  Pruyne therefore could be found to have had subjective awareness of the alleged constitutional violations, but to have failed to remedy them, establishing his personal involvement.

Pruyne's second argument, that he did not have the authority to remedy the violations, is also rejected, as at a minimum, there is a factual issue here.  First, a jury could find that Pruyne was aware of the alleged violations while Plaintiff was still in WCDOC custody through Plaintiff's mother's communications and from the fact that WCDOC records at that time already contained the information that Judge Friia did not object to concurrent time.  (P's 56.1 Ex. 12.)  And there is simply no requirement that Pruyne had to be placed on notice of the violations by Plaintiff himself in order to remedy them.  Indeed, had Pruyne assisted Plaintiff's mother, the violations could have been remedied much sooner than they were and while Plaintiff was still in WCDOC custody.  Had Pruyne looked into Plaintiff's calculation on March 8 when (taking the evidence in the light most favorable to Plaintiff) he first learned of the possible error, he could have reached out to the White Plains City Court, and the error could have been rectified before Plaintiff was transferred to DOCCS's custody.  Then the rap sheet on which Rivera relied might well have indicated not just that Plaintiff had served sixty days and earned thirty days of good time on his ninety-day sentence, (*see* Rivera Decl. ¶ 27), but also that that sentence was to run concurrent to Plaintiff's sentence for violating his parole.

Second, even when Plaintiff was no longer in WCDOC custody, there are genuine issues of fact regarding whether Pruyne could have remedied the violation.  While the record is not

clear as to the source of the information in Plaintiff's rap sheet on which Rivera relied, it is a fair inference that at least some of it (how long Plaintiff served and how much good time he received) came from WCDOC.  Had Pruyne investigated and determined that the City Sentence was to be concurrent – by April, WCDOC's records included not only Time Commitment 1, but also the Parole Revocation Certificate of Disposition, which was sent to the WCJ on March 11, 2015, and set Plaintiff's MED as May 7, 2015, (Cosgriff Decl. Ex. 11) – he could have said as much in his letter, which Plaintiff could have used to notify DOCCS and set into motion Plaintiff's timely release.  At the very least, again considering the facts in the light most favorable to Plaintiff, Pruyne could have provided the documentation and informed Plaintiff that he was unable to do more because Plaintiff was now in DOCCS's custody, rather than giving the non-response response that he gave.  Finally, Pruyne's argument here goes to the merits of Plaintiff's constitutional claims, not personal involvement.  In other words, his argument is not really that he had no involvement, but rather that his involvement did not rise to the level of a constitutional violation because he could not have remedied the situation.  The Court will address that argument below, as it goes to the merits.  Accordingly, the Court finds that there are fact issues regarding Pruyne's personal involvement, and therefore it will consider the merits of Plaintiff's claims against Pruyne.

State Defendants also argue that they were not personally involved.  (*See* State Ds' Mem. at 22-23.)  Specifically, State Defendants argue that the constitutional violation, if any, was caused by the White Plains City Court's ambiguous disposition and other sentencing documents, and State Defendants merely adhered to that court's orders, effectuating Plaintiff's prompt release the moment the court issued corrected sentencing documents.  (*Id.* at 23.)  But, like Pruyne's second argument above, this argument is on the merits of the constitutional claims, not

personal involvement.  State Defendants do not dispute that they received Plaintiff's complaints regarding his sentence calculation, investigated those complaints, and responded to Plaintiff that his complaints were unfounded or unsubstantiated.  So State Defendants are not really arguing that they were not involved but rather are arguing that their involvement did not constitute a constitutional violation.  The Court will address those arguments in greater detail below, but they do not go to personal involvement.

Accordingly, County Defendant's and State Defendants' motions for summary judgment on the ground of lack of personal involvement are denied.[24]

### B.    Fourteenth Amendment Claim

State Defendants and County Defendant give Plaintiff's due process claim short shrift in their opening briefs, (State Ds' Mem. at 18 n.7; County D's Mem. at 10 n.3; *id.* at 13 n.6), but after Plaintiff argued in his memorandum/opposition that State Defendants and County Defendant violated his procedural due process rights guaranteed by the Fourteenth Amendment, (P's Mem. at 25), both sets of Defendants addressed Plaintiff's due process claims in their oppositions, (State Ds' Opp. at 19; County D's Opp. at 11).

In any event, after the parties submitted their papers in this case, the Second Circuit decided *Francis v. Fiacco*, 942 F.3d 126 (2d Cir. 2019).  The Second Circuit's *Francis* decision provides guidance on Plaintiff's procedural due process claim, and for the reasons explained below, leads to the conclusion that, at the very least there are factual questions regarding whether

---

[24] The Court rejects Plaintiff's argument that Pruyne is personally involved as a member of a conspiracy.  Plaintiff has offered no evidence that Pruyne and State Defendants had any communication, let alone that they entered into a conspiracy with each other.  *See Dilworth v. Goldberg*, 914 F. Supp. 2d 433, 462 (S.D.N.Y. 2012) (conclusory allegaitons of conspiracy do not suffice); *see also Walker v. Jastremski*, 430 F.3d 560, 564 n.5 (2d Cir. 2005) ("[C]onclusory or general allegations are insufficient to state a claim for conspiracy under § 1983 . . . .").

"Defendants failed to provide [Plaintiff] with procedural protections that the Due Process Clause required."  942 F.3d at 141.

When faced with a procedural due process claim under the Fourteenth Amendment, courts must proceed with the following two-step inquiry:  first, inquire "'whether there exists a liberty or property interest which has been interfered with,'" and second, inquire "'whether the procedures attendant upon that deprivation were constitutionally sufficient.'"  *Id.* (quoting *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989)).

### 1.      Liberty Interest

"The general liberty interest in freedom from detention is perhaps the most fundamental interest that the Due Process Clause protects."  *Id.* (collecting cases).  And while an individual who is validly convicted and sentenced to a period of incarceration is constitutionally deprived of his liberty, "an inmate has a liberty interest in being released upon the expiration of his maximum term of imprisonment."  *Id.* at 142 (internal quotation marks omitted).  In other words, "while a valid conviction subjects a defendant to a constitutional deprivation of his liberty, the determination of his sentence, and the state's compliance therewith, remain subject to due process protections."  *Id.*

> It follows naturally that a prisoner's liberty interest in freedom from detention implicates the Due Process Clause not only when a jury convicts him or when a court initially sentences him, but also when prison officials interpret and implement the sentence that the trial court has imposed.  In the typical case, implementation of the prisoner's sentence follows straightforwardly from the sentencing court's commitment order.

*Id.*

This case, however, is not the typical case.  Judge Friia apparently intended that the sentences run concurrently, not consecutively, as evidenced by Time Commitment 2.  For reasons that are unknown, she stated ambiguously in the Time Commitment and at the

sentencing that she had "no objection" to the sentences being run concurrently, (Time

Commitment; City Court Tr. at 6:19-25), arguably leaving it up to the parole or DOCCS

authorities to make the determination.  The New York State Board of Parole's Parole Revocation

Certificate of Disposition concluded that Plaintiff's MED was May 7, 2015, (Cosgriff Decl. Ex.

11), showing that Parole regarded the sentences as concurrent.  Yet, instead of making any effort

to determine Judge Friia's arguably unclear intention, each Defendant told Plaintiff in essence

that the sentences were to be run consecutively, that there was nothing he or she could do, and

that Plaintiff should contact another official or agency.  Nor did any Defendant consider the

Parole Revocation Certificate of Disposition in implementing Plaintiff's sentence.  As a result,

Plaintiff's sentence at the very least diverged from the sentence pronounced on Time

Commitment 2, and while there are factual disputes regarding when the Time Commitment 2

was created, if it was created on January 7, 2015 (the date on the document itself),[25] then

Defendants did not execute the sentence imposed by Judge Friia.  Accordingly, there is, at a

minimum, a factual dispute regarding whether Plaintiff's "sentence as implemented by the . . .

Defendants diverged from the sentence originally pronounced by the sentencing court," and thus

Plaintiff's claim "implicate[s] a liberty interest of the highest order." *Francis*, 942 F.3d at 142.

The Court rejects Defendants' arguments to the contrary.  County Defendant argues that

"'[p]rison grievance procedures do not confer any substantive right upon an inmate requiring the

procedural protections envisioned by the Fourteenth Amendment,'" and that  "Plaintiff 'does not

---

[25] Plaintiff argues that Time Commitment 2 was created on the date it bears – January 7, 2015 – the same date as the original Time Commitment.  (*See* P's Mem. at 7.)  State Defendants argue that it must have been created in June 2015, after Plaintiff requested it and just before Plaintiff's lawyer faxed it to DOCCS.  (State Ds' Mem. at 14-15.)  While I suspect a jury would find State Defendants' inferences more persuasive, I cannot find as a matter of law that Time Commitment 2 was created in June.

have a protected liberty interest in having his grievances investigated at the level of thoroughness that he desires, and therefore he cannot assert a due process claim as to such failures.'" (County D's Opp. at 11 (quoting *Torres v. Mazzuca*, 246 F. Supp. 2d 334,342 (S.D.N.Y. 2003).  But the liberty interest implicated here is not the adequacy and thoroughness of the grievance process that failed to rectify Plaintiff's over-incarceration; instead, it is the liberty interest Plaintiff has in having his sentence implemented correctly by his jailers.  As the Circuit explained in *Francis*, that is a liberty interest of the highest order that is protected by the Constitution, and, as explained in further detail below, placing the burden to correct the sentence on an incarcerated prisoner is a violation of due process.

State Defendants argue that there is no liberty interest in "parole jail time credit," and cite to the first page of a 1934 Supreme Court case that discusses whether a federal parolee who commits a new crime is entitled to serve the sentence for his new crime and the remainder of his parole concurrently.  (State Ds' Opp. at 19.)  Analysis of this argument deserves the same shrift State Defendants gave it:  the argument is rejected, as the issue here is not whether Plaintiff had some free-floating or pre-existing right to concurrent time – he obviously did not -- but whether he was held beyond the limit of the sentence that was actually imposed.

### 2.    Attendant Procedures

Having identified the liberty interest of which Defendants deprived Plaintiff, the Court must next consider whether the attendant procedures sufficiently protected that interest.  Here, specifically, the issue is whether Defendants in these circumstances should have done more to determine Judge Friia's intention.  "In determining 'what process is due,' [the Second Circuit] recognize[s] that 'due process is flexible and calls for such procedural protections as the particular situation demands.'"  *Francis*, 942 F.3d at 142-43 (quoting *Morrissey v. Brewer*, 408

U.S. 471, 481 (1972)).  To determine what process is due, the Court considers the three-step

framework laid out in *Mathews v. Eldridge*:

> First, the private interest that will be affected by the official action; second, the risk
> of an erroneous deprivation of such interest through the procedures used, and the
> probable value, if any, of additional or substitute procedural safeguards; and finally,
> the Government's interest, including the function involved and the fiscal and
> administrative burdens that the additional or substitute procedural requirement
> would entail.

424 U.S. 319, 335 (1976).

a.     Private Interest Affected

Regarding the first *Mathews* factors, Plaintiff's "interest in freedom from detention was

an interest of the highest order," and "[t]he importance of the private interest at stake here

requires no further elaboration."  *Francis*, 942 F.3d at 143.

b.     Risk of Erroneous Deprivation

Regarding the second *Mathews* factor, the risk of an erroneous deprivation based on the

procedures used here was unreasonably high.

> Under New York law,

> when a person who is subject to any undischarged term of imprisonment imposed
> at a previous time by a court of this state [here, the 2012 Putnam County Sentence]
> is sentenced to an additional term of imprisonment [here, the City Sentence], the
> sentence or sentences imposed by the court shall run either concurrently or
> consecutively with respect to each other and the undischarged term or terms in such
> manner as the court directs at the time of sentence.

N.Y. Penal Law § 70.25(1).  "If the court does not specify the manner in which a sentence

imposed by it is to run, . . . [a] definite sentence shall run concurrently with any sentence

imposed at the same time and shall be consecutive to any other term."  *Id.*

Here, there is a factual dispute as to whether the sentencing court did or did not specify

the manner in which the sentence was to run.  Plaintiff has provided Time Commitment 2, which

is dated January 7, 2015, indicating that the sentence was to run concurrently.  While no

Defendant received the Time Commitment 2 until June 8, 2015, that does not establish that the Time Commitment 2 did not exist until then.  And if it were created on the date on which it was dated (an inference the Court must accept as true on Defendants' motions), then the sentence imposed by Defendants would be erroneous and not in accordance with New York law.  Further, earlier than June, Defendants had not only Plaintiff's repeated statements, but also sentencing court documents that at the very least suggested that Judge Friia may have intended for the sentences to run concurrently, yet Defendants undertook no steps to determine whether Judge Friia imposed the sentences concurrently.

The procedure Defendants had in place, of essentially conducting no investigation into Plaintiff's sentence as imposed by Judge Friia or the ALJ, and not contacting the White Plains City Court or the New York State Board of Parole and obtaining Plaintiff's sentencing documents, creates a high risk that a sentence that is to be served concurrently, or as to which there is ambiguity on that score, will be erroneously implemented by Defendants to be served consecutively.  Every Defendant personally received a letter explaining that Plaintiff's sentence had been miscalculated because the sentences should have run concurrently instead of consecutively.  Yet not one of the Defendants took the time to contact the sentencing judge or the ALJ to determine whether the sentence was to be consecutive or concurrent.

As the Second Circuit noted in *Francis*, and as is true here, "New York has enacted a complex statutory scheme governing the imposition and implementation of criminal sentences. The sentence-calculation procedures on display here involved a coterie of non-lawyers interpreting that statutory scheme and then privileging their understanding of the law above the sentence pronounced by the sentencing court."  *Francis*, 942 F.3d at 143.  Indeed, when both WCDOC and DOCCS first calculated Plaintiff's maximum expiration date, they did so with

reference to their interpretation of the New York Penal Law – that the law allowed them to presume the sentences were to run consecutively unless Plaintiff provided documentation to the contrary.  (*See* Rivera Decl. ¶ 29; P's 56.1 Ex. 12.)  But the New York Penal Law does not place that burden on Plaintiff, and thus WCDOC and DOCCS should not presume anything absent sentencing documentation granting them authority to do so.  And, as the State Defendants acknowledged, they made their sentencing determinations without even having the benefit of the sentencing court's dispositions.  (*See* State Ds' 56.1 ¶ 36 (the only paper accompanying Plaintiff when he went into DOCCS custody was his "Parole Retaking Warrant"); Rivera Decl. ¶ 31 (when calculating Plaintiff's sentence, Rivera did not have the "White Plains City Court disposition," so Rivera "presumed [the sentence] to be consecutive").  Section 70.25(1)(b) dictates that a definite sentence is to run consecutively to any other term if the judge does not specify that it is to be concurrent, but that statute does not authorize nor permit Defendants to make that determination without information – or with only ambiguous information – from the sentencing court, or to require the incarcerated person to undertake the necessary inquiries.  Any regime that is based on correction officers interpreting the New York Penal Law to determine a prisoner's sentence, especially one in which the officers do not even need to have the sentencing judge's sentencing documents, creates an "unacceptably high" risk that Plaintiff "would be detained beyond his maximum term of imprisonment."  *Francis*, 942 F.3d at 143.

While Defendants did not directly address the *Mathews* factors, some of their arguments still go to this factor.  County Defendant argues that the availability of "written procedures" is sufficient process.  (County D's Opp. at 11 (internal quotation marks omitted)), and the County Defendant and State Defendants argue that the existence of Article 78 proceedings, as well as Article 70 proceedings and state court *habeas* petitions, provide other sufficient post-deprivation

remedies, (County D's Mem. at 10 n.3; County D's Opp. at 11 n.12; State Ds' Mem. at 18 n.7;

State Ds' Opp. at 15 n.7, 19.)  But the evidence in the record fails to show as a matter of law that

those processes were either available to Plaintiff or sufficient.

Plaintiff filed a grievance, which was denied on the seemingly incorrect ground that the

sentences could not lawfully run concurrently pursuant to N.Y. Penal Law § 70.30 – a position

that no Defendant attempts to defend – and his appeal was not decided until after he was

released.  (P's 56. Exs. 12-13.)  Additionally, even after Plaintiff filed grievances, had his mother

call County Defendant, had his mother write a letter to County Defendant, and wrote a letter to

County Defendant himself, Plaintiff was provided with no avenues for relief from County

Defendant, and instead was told to contact other agencies to help him.  Even more egregiously,

when Plaintiff contacted Hoy regarding his sentence miscalculation, she responded that she

needed "an official disposition (sentence + commitment) from the court stating said sentence to

run concurrently with parole time owed," which was "[Plaintiff's] responsibility to obtain."  (P's

56.1 Ex. 40.)  As the Second Circuit has explained, "merely notifying a prisoner that his liberty

might be in jeopardy and then placing upon him the burden of navigating the legal system, from

his prison cell and without counsel, does not satisfy the requirements of the Due Process

Clause."  *Francis*, 942 F.3d at 143-44.  Put simply, it goes against all logic to make an

incarcerated individual prove that he should be free after he has put his jailers on notice that his

sentence calculation may well be erroneous.  And the review processes employed by Defendants

were insufficient, as they did not lead anyone to adequately investigate Plaintiff's claims or

determine the true nature of his sentence or ultimately lead to his release.

Additionally, the availability of Article 78 and Article 70 proceedings, as well as *habeas*

petitions, does not satisfy due process on the facts here.  Where a Plaintiff alleges more than

"'random and unauthorized'" misconduct, but rather shows that "prison officials do not provide adequate process for addressing inmate complaints about the calculation of their sentences, and as a result of the inadequate procedures he was held past his release date," Article 70 and 78 petitions, as well as *habeas* petitions, are insufficient.  *Schultz v. Egan*, 103 F. App'x 437, 441 (2d Cir. 2004) (summary order).  Nor have Defendants shown that any such proceeding could have concluded rapidly enough to have rectified the error in the short time frame at issue.  *Cf. id.*

Moreover, "[t]he 'probable value' of 'additional or substitute procedural safeguards,' . . . is quite high."  *Francis*, 942 F.3d at 144 (quoting *Mathews*, 424 U.S. at 335).  In *Francis*, a state sentencing court imposed a sentence to run concurrently with a not-yet-imposed federal sentence, but state law did not permit "such forward-looking directives of concurrency." *Id.* at 133.[26]  The Second Circuit held that "[p]rompt notice to the sentencing court and both parties' attorneys of the perceived error in the prisoner's original sentence as initially pronounced will in many circumstances abate the risk of an erroneous deprivation of a prisoner's liberty altogether."  *Id.* at 144.  The same principle should apply here:  where the prison authorities lack information, or have ambiguous information, about the running of the sentence, prompt notice to the sentencing court and the attorneys will in many circumstances result in clarification.  This is evidenced here by the fact that – if Defendants' version of events is correct – the Clerk of the White Plains City Court created Time Commitment 2 in early June, promptly precipitating Plaintiff's release, once she was informed by Plaintiff in late May that his sentence had been miscalculated because the earlier documentation was not explicit that the sentence was

---

[26] No party has suggested that that state law – Penal Law § 70.30(2-a) – is implicated here, and it does not appear that it is, as it applies only to sentences imposed by a jurisdiction other than a New York court, and in any event, Judge Friia's sentence was the second one, because the ALJ's sentence, while pronounced later in time, was imposed on the earlier, undischarged Putnam County conviction.

to be concurrent.  *See id.* ("The ease of obtaining that result suggests that previous formal contact with the sentencing court . . . by DOCCS . . . could have effectuated the same result before [plaintiff's] federal sentence expired.").  Had just one Defendant taken the time to contact the White Plains City Court, Plaintiff would likely not have been deprived of his constitutional rights.  Accordingly, the Court finds that the risk of a deprivation of liberty based on the procedures Defendants used here was unreasonably high, while the probable value of placing the burden on Defendants to determine Plaintiff's correct sentence was also high.

c.     Burden of Substitute or Additional Process

Turning to the third *Mathews* factor, the Court finds that the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail, is quite low.  "The governmental 'function involved' here – prison officials' implementation of an inmate's sentence – was essentially ministerial.  Prison officials are charged with effectuating the sentencing court's sentence . . . . The ministerial nature of the role makes the addition of extra levels of procedure particularly feasible."  *Id.*  While *Francis* involved a sentence that could not be imposed in accordance with New York law, the Court finds that the same logic applies to the sentence implemented here, regardless of whose version of events is correct.  If Plaintiff is correct that Time Commitment 2 existed at the time the sentence was imposed, the implementation was inconsistent with the sentence imposed by the sentencing judge.  If Defendants are correct that the sentence as issued was ambiguous, Defendants failed to take minimal steps to clarify it once Plaintiff raised the issue.  Either way, it would not have been burdensome for Defendants to make a call, shoot an email, or send a letter to ensure that it was effectuating the sentence accurately.  Accordingly, the Court finds that it does not impose substantial fiscal or administrative burdens to require the

38

State and County to make inquiry or to notify the sentencing judge and the attorneys on the case that it finds a sentence to be ambiguous or that the State's or County's interpretation and implementation of a sentence may be at odds with the sentencing judge's intentions.

State Defendants argue that they "'did not have an independent obligation to obtain [Plaintiff's] misdemeanor sentence and commitment order,' and, accordingly, liability cannot rest with State Defendants where the lack of documentation as to the sentence is not provided by the court or a local agency providing a jail time credit certificate." (State Ds' Opp. at 20 (quoting *Ifill v. State*, 52 N.Y.S.3d 541, 544 (App. Div. 2017)).  Even assuming this is true,[27] whether Defendants previously had an obligation to obtain sentencing documents is irrelevant to the third *Mathews* factor.  What matters is whether "the fiscal or administrative burdens that the government will sustain as a result of this *additional* process" are high or low.  *Francis*, 942 F.3d at 145 (emphasis added).  And the procedural safeguards that would have protected Plaintiff here – that is, having DOCCS and WCDOC contact the sentencing court when it appears the sentencing court might have imposed the sentence to run concurrently but DOCCS and WCDOC have no disposition to confirm one way or the other – would create a negligible burden on

---

[27] It is not as clear as Defendants suggest that they have no obligation to obtain Plaintiff's sentencing documents.  As an initial matter, *Ifill* dealt with a claim of unlawful confinement, not due process, so while that case may be persuasive in connection with Plaintiff's Eighth Amendment claim, it does not apply to his due process claim.  Second, the New York Correction Law places a burden on DOCCS – to "communicate with the sentencing court, the inmate's defense attorney and the district attorney of the county in which such person was convicted" – when it "appears" that a person was sentenced erroneously.  N.Y. Correct. Law § 601-a.  Moreover, the Parole Manual provides that the first step in verifying credited time is to "review the Sentence and Commitment Order and/or Jail Time Certificate in the inmate's case folder/record for accuracy."  (Rivera Decl. Ex. A at 2.)  Accordingly, it appears that in certain circumstances, there is an obligation on the State, not the incarcerated individuals, to obtain sentencing documents.

Defendants.  Accordingly, the third *Mathews* factor also weighs in favor of finding a due process violation.

***

Having considered all three *Mathews* factors, the Court concludes that there are genuine factual disputes regarding whether Defendants violated Plaintiff's right to due process by failing to provide basic procedural protections in interpreting and implementing his sentence.

C.    **Eighth Amendment Claim**

The Eighth Amendment provides that "cruel and unusual punishments" shall not be "inflicted."  U.S. Const. amend. VIII.  "A plaintiff asserting an Eighth Amendment claim pursuant to 42 U.S.C. § 1983 must meet two requirements.  First, the alleged deprivation must be, in objective terms, sufficiently serious.  Second, the charged official must act with a sufficiently culpable state of mind."  *Francis*, 942 F.3d at 150 (internal quotation marks and citations omitted).  "The Second Circuit and other courts 'within and without the Circuit have held[] that detention beyond that authorized by law may violate the Eighth Amendment.'" *Goldring v. Davidson*, No. 18-CV-6201, 2020 WL 1547464, at *3 (S.D.N.Y. Apr. 1, 2020) (alteration omitted) (quoting *Sudler v. City of N.Y.*, 689 F.3d 159, 169 n.11 (2d Cir. 2012)). "Detention beyond the termination of a sentence can constitute cruel and unusual punishment if it is the result of deliberate indifference to the prisoner's liberty interest."  *Id.* (internal quotation marks omitted).

1.    **Whether the Confinement Was Privileged**

State Defendants first argue that they are entitled to summary judgment because Plaintiff's confinement was privileged.

When evaluating an Eighth Amendment violation for false imprisonment, the Court "look[s] to state law to determine the elements of the[] cause[] of action." *Tobias v. County of Putnam*, 191 F. Supp. 2d 364, 375 (S.D.N.Y. 2002). Under New York law, to establish an Eighth Amendment violation for false imprisonment, Plaintiff must establish "(1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Willey v. Kirkpatrick*, 801 F.3d 51, 70-71 (2d Cir. 2015) (internal quotation marks omitted). State Defendants argue that until they received Time Commitment 2 in June 2015, they properly considered the sentences to run consecutively because "the sentencing minutes, the disposition, and the Time Commitment, all indicated that the White Plains City Court did not order a concurrent sentence," (State Ds' Mem. at 20), noting repeatedly that the sentencing court's statement that it only "'had no objection'" to Plaintiff's sentence running concurrently with his parole violation, shows that Judge Friia did not order the sentences to run concurrently. (State Mem. at 6, 8, 13-14; *see id.* at 5, 19-20). But those facts are disputed. State Defendants concede that the sentencing minutes and the Time Commitment are at best ambiguous, (State Ds' Mem. at 17) – they do not establish that the sentence was *not* to run concurrently – and if Time Commitment 2 was created in January 2015, then it is clear that the sentencing court did explicitly order a concurrent sentence. There are thus genuine disputes of material fact as to what the sentence actually was.

But State Defendants took no action to obtain the sentencing disposition or any other information to determine what sentence Judge Friia ordered or what she meant when she said she had no such objection. Clearly, based on the Time Commitment 2, she intended to (and perhaps did) order the sentences to run concurrently at the time. Further, the New York State Board of

Parole document created for Plaintiff in March indicated that his maximum expiration date was May 7, 2015, (Cosgriff Decl. Ex. 11), which further suggests that both Judge Friia and the ALJ intended Plaintiff's sentences to run concurrently.  Perhaps a jury would find that Judge Friia's statements at the sentencing and on Time Commitment 1 were not sufficient to require that the sentences run concurrently, and perhaps they would determine that the Time Commitment 2 did not exist until June, but the Court cannot make those determinations on these motions. Accordingly, the confinement is not privileged as a matter of law, and State Defendants' arguments to that end are rejected.

### 2. Whether the Deprivation Was Sufficiently Serious

State Defendants next argue that Plaintiff's period of over-incarceration is *de minimis* and thus does not constitute a sufficiently serious deprivation.  (State Mem. at 22; State Opp. at 18.) But State Defendants cite to cases in which the period of over-detention was shorter than it was here.  *See Hayes v. Annucci*, No. 14-CV-8845, 2016 WL 1746109, at *5 (S.D.N.Y. April 29, 2016) (seventeen days); *Brunson v. Duffy*, 14 F. Supp. 3d 287, 294 (S.D.N.Y. 2014) (twenty-one days).  And the Second Circuit has explained that a period of over-detention of thirty-four days falls somewhere between the range that a court could determine is sufficient or *de minimus* as a matter of law.  *See Akande v. U.S. Marshals Serv.*, 659 F. App'x 681, 684 (2d Cir. 2016); *see also Lane v. Tilbe*, No. 18-CV-438, 2018 WL 6982089, at *3 (N.D.N.Y. Oct. 29, 2018) ("[T]he Court does not agree that it is settled in the Second Circuit that detaining an individual for twelve days past his maximum expiration date does not violate the Eighth Amendment as a matter of law, and the Court declines to make a determination that an unauthorized confinement of twelve days is nonviolative as a matter of law."), *report and recommendation adopted*, 2018 WL 6289668 (N.D.N.Y. Dec. 3, 2018).  Here, Plaintiff was detained at least thirty days past his

maximum release date had his sentences been run concurrently, and thus the Court cannot determine as a matter of law whether that deprivation was sufficiently serious.  Thus, both Plaintiff's and State Defendants' motions for summary judgment are denied on that ground.

### 3. Whether Defendants Had a Sufficiently Culpable State of Mind

To establish deliberate indifference, or a culpable state of mind, Plaintiff must show that Defendants "intended the [deprivation] to occur or acted clearly unreasonably in light of the known circumstances by failing to act to prevent the constitutional injury." *Peterson v. Tomaselli*, 469 F. Supp. 2d 146, 167 (S.D.N.Y. 2007) (internal quotation marks omitted). "Deliberate indifference requires more than mere negligence, but it can include culpable recklessness, meaning 'a conscious disregard of a substantial risk of serious harm," or choosing 'an easier and less efficacious' plan." *Francis v. Fiacco*, No. 15-CV-901, 2016 WL 3448617, at *9 (N.D.N.Y. June 20, 2016) (quoting *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998)). "'Deliberate indifference has been demonstrated in those cases where prison officials were put on notice and then simply refused to investigate a prisoner's claim of sentence miscalculation.'" *Shorts v. Bartholomew*, 255 F. App'x 46, 53 (6th Cir. 2007) (unpublished decision) (quoting *Moore v. Tartler*, 986 F.2d 682, 686 (3d Cir. 1993)).

Here, there is enough evidence of deliberate indifference on the part of each Defendant to get Plaintiff's claims to a jury.[28]  As noted, either Plaintiff, his mother, his lawyer, or some combination of the three communicated with each Defendant, providing explanations as to why Plaintiff's sentence had been miscalculated.  Each Defendant, even with the awareness that

---

[28] County Defendant argues only that Plaintiff has failed to establish the culpability prong of an Eighth Amendment claim.  (County D's Mem. at 13-17.)  While it seems County Defendant also could have disputed whether he was confining Plaintiff at the time of the over-detention, the Court need not reach this issue in light of its ultimate disposition.

Judge Friia might have intended to have Plaintiff's sentences run concurrently, buried his or her head in the sand and placed the burden on Plaintiff to establish his MED.  This is not as a matter of law mere negligence, as the Defendants put thought and effort into their responses, and their actions permitted Plaintiff's continued incarceration past the date by which he should have been released.  In short, there is at least a fact issue as to whether refusing to provide any assistance to an inmate who raises a colorable claim of over-detention constitutes deliberate indifference. Accordingly, Defendants' arguments that they were not sufficiently culpable are rejected, and that Plaintiff's Eighth Amendment claims are sufficiently supported to go to a jury.

> ### D.    Qualified Immunity

While Plaintiff has done enough to raise genuine issues of material fact as to both his Fourteenth and Eighth Amendment claims, the Court is bound by the Second Circuit's *Francis* decision and must grant Defendants summary judgment on qualified immunity grounds on both claims.

Government officials exercising discretionary functions are entitled to qualified immunity shielding them from damages in a § 1983 suit "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known," *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982), or insofar as it was objectively reasonable for them to believe that their conduct did not violate such rights, *see Anderson v. Creighton*, 483 U.S. 635, 638-39 (1987).  "'Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments,' and 'protects all but the plainly incompetent or those who knowingly violate the law.'"  *Stanton v. Sims*, 571 U.S. 3, 6 (2013) (*quoting Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)).  A Government official sued in his individual capacity is entitled to qualified immunity

> (1) if the conduct attributed to him was not prohibited by federal law; or (2) where that conduct was so prohibited, if the plaintiff's right not to be subjected to such conduct by the defendant was not clearly established at the time it occurred; or (3) if the defendant's action was objectively legally reasonable in light of the legal rules that were clearly established at the time it was taken.

*Munafo v. Metro. Transp. Auth.*, 285 F.3d 201, 210 (2d Cir. 2002) (internal quotation marks, citations, and alterations omitted); *see Creighton,* 483 U.S. at 639 ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the objective legal reasonableness of the action assessed in light of the legal rules that were clearly established at the time it was taken.") (internal quotation marks and citation omitted). Summary judgment should be granted where "the defendant shows that no reasonable jury, viewing the evidence in the light most favorable to the [p]laintiff, could conclude that the defendant's actions were objectively unreasonable in light of clearly established law." *Husain v. Springer*, 494 F.3d 108, 131 (2d Cir. 2007) (internal quotation marks omitted).

Since the Supreme Court's decision in *Pearson v. Callahan*, 555 U.S. 223 (2009), a lower court has the option to proceed directly to the question of whether the right or rights at issue were clearly established and, if the court finds that the rights were not clearly established and that qualified immunity applies, "avoid the 'unnecessary litigation'" of determining whether defendants violated plaintiff's constitutional rights. *Francis*, 942 F.3d at 140 (alteration omitted) (quoting *Pearson*, 555 U.S. at 237). Indeed, "addressing constitutional arguments where qualified immunity applies 'sometimes results in a substantial expenditure of scarce judicial resources on difficult questions that have no effect on the outcome of the case.'" *Id.* (quoting *Pearson*, 555 U.S. at 236-37). "Nevertheless, there remains a role for courts to rule on constitutional questions even in cases where qualified immunity ultimately determines the result." *Id.* Where a court could help to clarify uncertain questions and give guidance to

officials about how to comply with legal requirements, a court may exercise its *Pearson* discretion to address constitutional claims even if they are ultimately barred by qualified immunity.  *Id.* at 140-41.  Here, the Court has elected to use its *Pearson* discretion to consider Plaintiff's constitutional claims, even though, as discussed below, his claims fail on qualified immunity grounds.  This is the first case, as far as the Court can tell, to apply *Francis* to an ambiguous rather than illegal sentence, which will help provide guidance to correction officials moving forward.  Additionally, the Court's opinion may prevent correction officers from violating the rights of incarcerated individuals in the future.

### 1.  Fourteenth Amendment Claim

Regarding Plaintiff's Fourteenth Amendment claim, the holding in *Francis* directly controls this case.  In *Francis*, as noted, when faced with a sentence that was intended to be concurrent but was unauthorized under New York law, DOCCS imposed the sentences to run consecutively.  *Id.* at 133.  The Second Circuit found that DOCCS's failure to provide adequate notice of its action to the state court or the lawyers in the case was a due process violation.  *Id.* at 141.

The Second Circuit then scoured its and the Supreme Court's precedents to determine whether the constitutional due process right in that case was clearly established.  It determined that if the right were clearly established, it would have to be based on one of two previous cases, *Hill v. United States ex rel. Wampler*, 298 U.S. 460 (1936), or *Earley v. Murray*, 451 F.3d 71 (2d Cir. 2006).  *See Francis*, 942 F.3d at 146-48.  But both *Wampler* and *Earley* involved prison officials augmenting a defendant's sentence with additional conditions found nowhere in the original commitment order, and both dealt with the interpretation of a single sentence, as opposed to the "interaction between two sentences imposed by different jurisdictions."  *Id.* at

147.  And following *Wampler* and *Earley*, the Second Circuit "expressly declined to resolve the question whether [those cases] 'should apply not only with regard to a single sentence, but also in the context of a sentencing judge's pronouncement as to the relationship between the sentence he is imposing and another sentence imposed in a separate proceeding.'" *Id.* at 148 (quoting *Sudler*, 689 F.3d at 173).  Accordingly, the Second Circuit concluded, in a holding equally applicable to the two sentences at issue here, that it "cannot say that 'every reasonable official would interpret [*Wampler* and *Earley*] to establish the unconstitutionality of the State Defendants' conduct in this case." *Id.* (alteration in original) (internal quotation marks and emphasis omitted).

The Second Circuit then analyzed whether the plaintiff's claim there was clearly established under the *Mathews* test described above.  It looked to the *Sudler* case, in which the plaintiff argued that the defendants violated his due process rights under the *Mathews* balancing test. *Id.* at 149.  The *Sudler* court did not decide whether a due process violation had occurred, instead finding that the defendants were entitled to qualified immunity, *see Sudler*, 689 F.3d at 173, in that "the State Defendants had little guidance in weighing the three *Mathews* factors in the circumstances confronting them," *id.*at 177.  Thus, *Sudler* did not clearly establish the plaintiff's due process rights in *Francis*, nor does it clearly establish Plaintiff's rights here.  And, "[n]o case before or after *Sudler* has even considered whether prison officials implementing a state sentence violate the Constitution by failing to provide notice to the sentencing court and attorneys, let alone subjected such a claim to a *Mathews* analysis."  *Francis*, 942 F.3d at 149.

Thus, until *Francis*, which was decided after the events at issue here, Plaintiff's Fourteenth Amendment right here was not clearly established.  It cannot be said that every reasonable prison official would have understood at the time that he or she was required to

contact the sentencing court to confirm whether the sentence was to be served concurrently or consecutively.  Nor would every reasonable correction officer have known that his or her conduct violated due process under the *Mathews* test.  Accordingly, Plaintiff's due process right here was not clearly established at the time of the constitutional violations, and thus Defendants are shielded by qualified immunity.

### 2.    Eighth Amendment Claim

Defendants are also entitled to summary judgment on Plaintiff's Eighth Amendment claim, as they are protected by qualified immunity.  "No Supreme Court or Second Circuit caselaw has clearly established either prong of the particular Eighth Amendment claim that [Plaintiff] asserts here." *Id.* at 150.  With regard to the first element of an Eighth Amendment claim – whether the violation was sufficiently serious – "[n]o case establishes that [this period] of additional incarceration, although of serious dimension, crossed the threshold of sufficient objective seriousness to constitute 'cruel and unusual punishment' under the Eighth Amendment." *Id.* (alteration omitted).  And with regard to the second element of an Eighth Amendment claim – whether Defendants were sufficiently culpable – "[n]o case has found this standard met under circumstances like these, where the State Defendants weighed the proper course of action, acted in accordance with a reasonable understanding of a complicated area of state law, and relayed the legal basis for their actions to [Plaintiff] in response to his subsequent inquiries." *Id.*  Accordingly, neither the length of Plaintiff's detention nor Defendants' failure to contact the White Plains City Court, the ALJ, or Plaintiff's counsel, were clearly established

violations of Plaintiff's Eighth Amendment rights at the time they were committed.  For that reason, Defendants are entitled to summary judgment on qualified immunity grounds.[29]

## IV.  **CONCLUSION**

For the foregoing reasons, State Defendants' and County Defendant's motions for summary judgment are GRANTED, and Plaintiff's cross-motion for summary judgment is DENIED.  The Clerk of Court is respectfully directed to terminate the pending motions, (Docs. 175, 177, 202, 205), and close the case.

**SO ORDERED.**

Dated: June 29, 2020
       White Plains, New York

_____
   CATHY SEIBEL, U.S.D.J.

---

[29] The Second Circuit in *Francis* noted in its analysis of the plaintiff's Fourteenth Amendment claim that it addressed the merits of that claim because had it not, the defendants "could continue to withhold those procedural protections – and thus continue to violate the Constitution – *ad infinitum*." *Francis*, 942 F.2d at 141.  For that same reason, the Second Circuit may consider taking up the merits of Plaintiff's Eighth Amendment claim here, as a period of over-confinement of more than a month strikes this Court as sufficiently serious to constitute a constitutional violation.  Likewise, refusing to provide any assistance to an inmate who raises a colorable claim of over-detention may well constitute deliberate indifference.